IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINE L. LUFFEY,

      Plaintiff,

vs.

CITY OF PITTSBURGH,

      Defendant.

Civil Action No. ___25-1758___

Judge: _____

**JURY TRIAL DEMANDED**

**COMPLAINT**

### I.    Introduction

1.    In 1975, a federal court found that the City of Pittsburgh had systemically discriminated against women seeking to become police officers. The court entered a preliminary injunction requiring equality in hiring for women and blacks at a time when only .8% of police personnel were female. By 1990, 27% of sworn police officers in Pittsburgh were women. But a year later, the injunction was lifted. Once hiring women was no longer required, the number of sworn female officers in Pittsburgh began to decline. It fell to 22% in 2000, to 16% in 2015 and then to less than 15% today, representing a 57% decline from its peak.

2.    Like many police departments, the Pittsburgh Bureau of Police ("PBP") has a masculine culture rooted in the Bureau's origins as an almost exclusively male occupation.[1] This culture emphasizes traditionally masculine traits such as physical strength, aggressiveness, command presence and a warrior mentality. The Bureau's structure, emphasizing hierarchy,

---

[1] "Traditionally, police work has been seen as a masculine profession, and the general image of policing has focused on the aspects that are stereotypically male." PJ Verrecchia, *Learning from the Perceptions of Women in Policing: A Survey of Women Police Officers*, Police Chief Online, March 20, 2024, https://www.policechiefmagazine.org/learning-perceptions-women-in-policing/.

authority and control, reinforces these masculine norms, as does the well-documented and accelerating trend of police militarization.

3.      Unsurprisingly, female police officers who don't conform to masculine expectations are vulnerable to sex-based discrimination by men and women up the chain of command. Female-on-female discrimination can occur where women in command positions feel pressure to prove their loyalty to the dominant male culture, or pressure to distance themselves from gender stereotypes about "weakness."

4.      To be sure, not all women in leadership positions discriminate against other women because of sex; indeed, most probably do not. But Zone 3 Pittsburgh Police Lt. Sandra McGuigan (Ret.) ("McGuigan") was one who did, and she had no compunctions about hiding it.

5.      According to McGuigan, one subordinate female police officer was a "whore" because she had breast implants. Another was a "drunken slut." And Plaintiff herein, Master Police Officer Christine Luffey ("Plaintiff" or "Luffey"), a 30-year veteran police officer with accolades almost too numerous to count, was "useless" and a "waste of a body."

6.      One retired female police officer who worked under McGuigan for many years attributes McGuigan's sex-based discrimination against other women to McGuigan's jealousy of women who were younger, smarter or prettier than she was. Another attributes it to McGuigan's gendered notion of "real" police work, and her disdain for female officers such as Luffey who performed police work that was insufficiently masculine. Whatever its ultimate source, McGuigan's discrimination against women in the workplace because of sex was unlawful. Because Plaintiff was a victim of McGuigan's unlawful sex-based discrimination, she brings this action under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act for all appropriate legal and equitable relief.

2

## II.    Parties

7.    Plaintiff Christine Luffey is an adult person who resides in the Western District of Pennsylvania.

8.    Defendant City of Pittsburgh is a municipal corporation and City of the Second Class, with its executive offices located at 512 City County Building, 414 Grant Street, Pittsburgh, Pennsylvania 15219, which at all times material to this Complaint was operated by and through its policymaking officials and authorized agents acting within the scope of their agency and in accordance with the custom, policies and practices of the City and under color of state law.

## III.    Jurisdiction, Venue and Exhaustion

9.    This Court has subject matter jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over Plaintiff's PHRA claims under 28 U.S.C. § 1367.

10.    Venue is proper because the events at issue in this case occurred in the Western District of Pennsylvania.

11.    Plaintiff timely filed a Charge of Discrimination with the EEOC at Charge No. 533-2025-00168, which was cross-filed with the PHRC.  More than 365 days have passed since Plaintiff filed her Charge.  Plaintiff has received a Notice of Right to Sue and this action is filed within 90 days of the issuance thereof.

**IV.    Facts Giving Rise to this Action**

    **A.    Christine Luffey's 30 years of distinguished service to the City of Pittsburgh and the Pittsburgh Bureau of Police – an unmatched legacy**

12.    Luffey joined the PBP on July 5, 1993 and was a 30-year veteran police officer at the time of her constructive discharge.

13.    For many years prior to her constructive discharge, Luffey worked as a Community Relations Officer from the Zone 3 police station.  She built a reputation as a dedicated police officer, not only fighting crime, but also spearheading outreach programs, charity initiatives and tirelessly advocating for animal welfare.

14.    From her earliest years, Luffey showed a passion for helping animals.  "If there was ever an advocate for animal welfare in Pittsburgh, it's Officer Christine Luffey," a local news station remarked, noting that she "helped rescue dozens of abandoned or abused animals over the past three decades."

15.    About five years into her tenure, Luffey sought permission to organize a fundraiser to aid homeless animals.  With her supervisors' approval in 1998, she launched what would become the annual "Biscuits Bingo" charity event.  The first Biscuits Bingo was held at a local parish and raised roughly $5,000 for several animal welfare organizations.  Luffey's vision and commitment allowed the event to grow steadily each year.  By the mid-2010s, Biscuits Bingo had become a hugely popular tradition: the 16th annual event in 2014 drew over 420 participants and raised a record $21,225 for area animal shelters and rescue groups.  Local businesses donated hundreds of prizes, and even city officials – like City Council President Bruce Kraus – pitched in.  Over the years, Biscuits Bingo grew larger: the 25th annual event in 2023 raised nearly $65,000, benefiting organizations like Animal Friends, Humane Animal Rescue of Pittsburgh, Pittsburgh CAT, the Bow Wow Buddies Foundation and the Homeless Cat

Management Team.  What started as Officer Luffey's small fundraiser in the late '90s had, by

the 2020s, channeled hundreds of thousands of dollars to local animal shelters.



**City of Pittsburgh**

510 City-County Building
414 Grant Street
Pittsburgh, PA 15219

**Text File**

| | |
|---|---|
| **Introduced:** 3/24/2023 | **Bill No:** 2023-1379, **Version:** 1 |
| **Committee:** City Council | **Status:** Adopted |

*WHEREAS,* in 1998 Officer Christine Luffey, an animal lover and advocate, created the beloved annual fundraiser "Biscuits Bingo" which started as a small event in St. Pamphilus church; and,

*WHEREAS,* the success and popularity of this event has grown exponentially over the years with last year's event raising nearly $60,000 to help animals around the City of Pittsburgh and this year's event selling out in less than two weeks; and,

*WHEREAS,* sponsored by Pittsburgh Bureau of Police and with the assistance of Officer Luffey's right and left hands, Ann Yeager and DJ Suhoski, the 2023 event on March 25, 2023, will mark its 25th Anniversary. It will host 650 bingo players and raise much needed funds for local animal shelters and animal welfare organizations in Pittsburgh; and,

*WHEREAS,* the event is held at the IBEW Hall located on Pittsburgh's South Side, and for years the use of the space has been generously donated by Tom McIntyre, Business Manager, free of charge. The event would also like to thank AMPCO-Pittsburgh Charitable Foundation for their sizable donation; and,

*WHEREAS,* this year's event could raise as much as $60,000 for animal assistance at Angel Ridge Animal Rescue, Animal Advocates, Animal Friends, Bow Wow Buddies Foundation, Forever Home Beagle Rescue, Homeless Cat Management Team, Humane Action Pittsburgh, Humane Animal Rescue of Pittsburgh, Kindred Spirits Animal Rescue, Pigsburgh Squealers, Pittsburgh CAT, and Rabbit Wrangler; and,

*WHEREAS,* "Biscuits Bingo" is truly an amazing, family friendly event. The love, kindness, and dedication of all involved has contributed to the astounding success "Biscuits Bingo" has become. Because of the generosity, vision and dedication of Officer Christine Luffey, so many more of Pittsburgh's animals in need can now be helped; and,

*NOW, THEREFORE BE IT RESOLVED,* that the Council of the City of Pittsburgh does recognize, celebrate and thank the countless volunteers and donors who have made 25 years of "Biscuits Bingo" a triumph; and,

*BE IT FURTHER RESOLVED,* that the Council of the City of Pittsburgh does hereby declare Saturday, March 25th, 2023 to be *"25th Anniversary of Biscuits Bingo day"* in the City of Pittsburgh.

16.    Luffey also devoted herself to helping Pittsburgh's people in need.  For years, she

oversaw the PBP's annual "Stuffed with Love" project, a Thanksgiving Day program in which

5

police officers deliver hot turkey dinners to families and seniors who might otherwise go

without. She was a key organizer of this city-wide effort – coordinating donations, assembling

volunteer teams and personally delivering meals in her district. Under Luffey's leadership, the

program expanded dramatically. By 2023 it provided over 4,000 Thanksgiving meals across the

city, involving partnerships with churches and community groups to prepare and package the

food.



City of Pittsburgh

510 City-County Building
414 Grant Street
Pittsburgh, PA 15219

**Text File**

| | |
|---|---|
| **Introduced:** 12/9/2008 | **Bill No:** 2008-0975, **Version:** 1 |
| **Committee:** City Council | **Status:** Adopted |

WHEREAS, the Holidays can be a difficult time, particularly for Seniors, those in need and those with disabilities, who may be without family members or whose family member's may live out of the area and who may not be able to prepare a Holiday meal for themselves ; and

WHEREAS, for the last eight years, all of those citizens of the South Side and Hilltop Communities have been blessed with a warm meal each Thanksgiving; and

WHEREAS, these people, above all others, are responsible for making the holiday brighter for our neighbors Penny and Tony Folino, the staff of Tom's Diner;  Officer Christine Luffey and the officers and staff of Zone 3 Police station; and

WHEREAS, Penny Folino, organized volunteers and solicited donations from members of the business community and Tony Folino and the Staff of Tom's Diner, spent hours  preparing 70 turkeys and all of the fixings to serve over 1,200 delicious meals; and

WHEREAS, volunteers, too numerous to mention, assembled those 1,200 tradition Thanksgiving meals, with all the fixings, in take out containers and packed the boxes for delivery; and

WHEREAS, Officer Christine Luffey, coordinated the hundreds and hundreds of requests for dinners and made sure that they were delivered, still hot, by the dedicated officers of the Zone 3 Police Station;

NOW THEREFORE BE IT RESOLVED, that the Council of the City of Pittsburgh does, hereby, commend and thank Penny and Tony Folino, the staff of Tom's Diner and Officer Christine Luffey and the Officers of Zone 3 for all that they have done for our neighbors in need of a warm meal and the warm glow of knowing that someone cares, on this national day of Thanksgiving.



17.     While working as a Community Relations Officer, Luffey became Pittsburgh's de facto animal-cruelty officer due to her passion and specialized expertise.  Fellow officers and residents nicknamed her "the dog cop," a label she embraced with pride.  Over the years, she

handled countless cases of animal neglect, abuse and rescue at the intersection of law enforcement and animal welfare. Luffey often partnered with the City's Animal Care & Control unit and local humane organizations to investigate complaints and save animals in distress. By 2023 she was known as a bureau veteran "specializing in animal neglect and abuse," and was routinely called upon in such cases.

18.     In 2012, Luffey was contacted by the Humane Society of the United States ("HSUS") about Darryl Bryant, a dog fighter living in Pittsburgh. Bryant was well known in the illegal dog fighting community and ran a business called "Wargasm Kennels," through which he trained and fought dogs in Pennsylvania and other States.

19.     Bryant obtained his dogs by responding to ads of people looking to re-home their pit bulls. Once Bryant brought a new dog home, he would force the dog to fight one of his dogs. If the dog refused to fight, Bryant would electrocute it in his living room.

20.     Luffey obtained a search warrant for Bryant's mother's house where she found evidence of dog fighting. Luffey and HSUS agents extricated 13 dogs from a life of torture. Bryant was convicted for his crimes and sentenced to 3 ½ - 6 years in prison.

21.     In 2016, Luffey helped save "Effie," a severely starved pitbull mix who was left in an abandoned Homewood apartment. A pest control worker had photographed the skeletal dog and alerted authorities. Officer Luffey teamed up with Humane Society Officer Ed Mitchell to track Effie to another residence and managed to rescue her just in time. At the shelter, the young dog weighed only 23 pounds – roughly half of a healthy weight – and had eaten plastic and cloth in desperation. Luffey vowed to bring the owner to justice and personally adopted Effie in September, 2016.

22.      In November of 2016, Luffey and Animal Friends Humane Officer Kathy Hecker were notified of an emergency, animal-related situation in Brookline, where the Allegheny County Sheriff was executing an eviction.  Luffey and Hecker found an adult woman (Barbara Yogmas), her elderly mother (Barbara Courey), and about 180 animals (mostly birds, dogs, cats, and ferrets) living in deplorable conditions.  Luffey, Hecker and Animal Care and Control officers removed all the animals and transported them to Humane Animal Rescue.  Luffey also found a special needs child hiding in the house.  Luffey arrested Barbara Yogmas on scene for Endangering the Welfare of a Child.  Luffey filed the appropriate animal-related charges against Yogmas and her mother.  This was the largest animal seizure in the history of the City of Pittsburgh.

23.      Through numerous cases like these, Luffey became the go-to officer for animal neglect and cruelty matters in Pittsburgh, and frequently collaborated with humane society agents, veterinarians and rescue volunteers.

24.      Luffey leveraged these relationships to ensure rescued animals got proper care.  In media interviews, she urged the public to speak up about abuse and even encouraged witnesses to use cell phones to document cruelty as evidence.

25.      Within the Bureau, Luffey advocated for improvements such as the formation of a specific unit that would focus on animal cruelty cases.  Although no formal animal crimes unit has been established, Luffey's work effectively filled that void.  A Pittsburgh city councilmember described her as "one of the most well-respected police officers that we have."

26.      Over the years, Luffey also participated in youth engagement and public safety education events.  She frequently attended neighborhood meetings, "National Night Out" block parties, school programs and charity drives representing the police bureau.  She has supported

local Humane Society adopt-a-pet days (using her platform to help animals find homes).
Colleagues and community members have attested to her near-constant presence at any positive
outreach effort.

27.     Luffey earned considerable recognition, both formally and informally.  Within
Pittsburgh, she was widely regarded as a compassionate officer who went "above and beyond."
Community members lauded her as "Pittsburgh's best friend in animal law enforcement," a title
bestowed when she received a Lifetime Service to Animals award in 2023.  This award was
presented by Humane Action Pittsburgh/Pennsylvania to honor Luffey's career-long
contributions to animal protection.  It is the organization's highest accolade.

28.     In 2024, Luffey was further honored with the "Circle of Courage Award," which
recognized her dedication to helping both animals and people in need.  The woman who
nominated Luffey cited Luffey's tireless work with at-risk animals and her generous efforts in
the community as emblematic of courage and kindness.

29.     In short, Luffey was a trailblazer in integrating animal welfare with community
policing.  She carved out a niche in humane law enforcement within the PBP, inspiring others to
view animal cruelty as a serious crime and animals as worthy of protection.  Luffey also
extended deep empathy to vulnerable people, delivering Thanksgiving dinners to those in need.
By investing in these relationships, she built trust and showed a softer side of policing that
residents profoundly appreciated.

**B.      The beginning of the end**

30.     In September 2023, Lt. Jeffery Abraham was transferred to Zone 3 and was
promoted to the position of Commander.

31.     Abraham shared McGuigan's gendered view that Plaintiff did not perform real police work, and immediately began working with McGuigan to make Plaintiff's life miserable.

32.     Commander Abraham and Lieutenant McGuigan were supervisors with the power to effect significant changes in Plaintiff's employment status, including but not limited to discipline, suspension, demotion, promotion, termination and reassignment with significantly different responsibilities.

33.     Abraham and McGuigan fired their first shot at Luffey on October 5, 2023, when they sent an email to Luffey relating to an incident that occurred three months earlier on July 4, 2023 when Plaintiff was working with her partner Officer David Shifren in downtown Pittsburgh.

34.     In their email, Abraham and McGuigan alleged that Plaintiff had "failed to intervene and assist [] other Officers with a large fight" among juveniles, and was taking pictures/video with her cell phone.  Abraham and McGuigan ordered Plaintiff to file a special report explaining herself.

35.     Plaintiff filed the special report the same day.  She explained that she and Shifren had not encountered an active fight, but rather the aftermath of one, and that she was using her cell phone to take pictures for identification purposes because her body camera had malfunctioned that day.

36.     Plaintiff further explained that she and Shifren, along with other officers detailed to downtown, responded to every active fight they came across.

37.     Abraham and McGuigan met with Luffey on October 12, 2023.  In this meeting, they yelled at Luffey, saying that she was incompetent and a coward.  They told her that she

would be closely watched moving forward, and that she would need pre-clearance from them before responding to any animal-related calls.

38.     Also during this meeting, Abraham told Luffey that she would need to prepare a proposed agenda of her work activities a week in advance subject to his approval.  Abraham also said he was going to require Plaintiff to stand for roll call, something Plaintiff had not been required to do for 20 years.

39.     Notwithstanding Plaintiff's explanation of the July 4, 2023 incident, Abraham and McGuigan ordered Plaintiff to engage in remedial training at the Academy.

40.     Abraham and McGuigan did not level similar allegations and accusations against Officer Shifren, or order him to file a special report, or order him to engage in remedial training.

41.     When Plaintiff would say "Good morning" to Abraham, he would not respond.

42.     In November 2023, Plaintiff began hearing from other officers that Abraham and McGuigan had placed a target on her back and were hoping to cause Plaintiff to retire.

43.     In December 2023, Plaintiff began hearing from other officers that Abraham and McGuigan planned to kick Plaintiff out of the office that she had been using for the past 20 years, and offer the space to a male police officer.

44.     Plaintiff was also told that Abraham and McGuigan planned to force Plaintiff to work in a small, noisy call room at the back of the station, where there was substantial commotion caused by other officers who also used the room.

45.     As these events were unfolding, Plaintiff heard from her colleagues that Abraham and McGuigan had referred to Plaintiff as "useless," serving "no purpose," and "a waste of body."

46.     Also during this time, Abraham and McGuigan deprived Plaintiff of the use of her patrol vehicle, even though multiple patrol vehicles were available for use, forcing Plaintiff to use her personal vehicle for her work duties.  In contrast, male police officers had full access to all Zone 3 resources, including patrol vehicles.

47.     Abraham and McGuigan cut back on Plaintiff's investigative support, while not treating male officers in a similar fashion, and created meaningless administrative requirements for Plaintiff to complete that male officers were neither asked nor required to complete.

48.     Adding insult to injury, they further told Plaintiff that she would need to submit all criminal complaints she drafted for pre-approval before filing, and that she would need to provide McGuigan with a daily written summary of her intended activities for the day.  No male officer in Zone 3 was burdened with these onerous and humiliating requirements.

49.     These actions and this information prompted Plaintiff to file a formal written complaint on December 15, 2023 alleging that McGuigan and Abraham had created a hostile work environment.

50.     While the investigation of Plaintiff's complaint was pending, McGuigan locked eyes with Plaintiff at the police station, placed her hand on her service weapon and stared at Plaintiff as though preparing to draw and fire her weapon.  McGuigan repeated this menacing conduct at least three times.

51.     On or about February 23, 2024, Luffey went on approved leave from work.

52.     On February 28, 2024, the City of Pittsburgh Department of Human Resources & Civil Service DHR Unit sustained Plaintiff's hostile work environment claim against McGuigan, finding that it was supported with merit.

53.     Remarkably, however, the City then immediately closed its investigation.

54.     Upon information and belief, the City took no remedial action against McGuigan.

55.     To the extent the City took remedial action against McGuigan, the City did not apprise Plaintiff of same and did not advise Plaintiff that the City was actually going to do something about the hostile work environment that Plaintiff had been forced to endure.

56.     Even though Abraham had worked hand-in-hand with McGuigan in creating the hostile work environment of which Plaintiff complained, the City refused to find that he had engaged in misconduct.

57.     Also on February 28, 2024, Plaintiff received a phone call from Public Safety Director Lee Schmidt.

58.     Schmidt told Plaintiff that she should retire.

59.     Plaintiff advised that she needed time to process; Schmidt said that he would call back a couple of weeks later to check in with Plaintiff, but he never did.

60.     On April 1 and 2, 2024, Plaintiff received emails from the City advising her that she was AWOL, even though Plaintiff was on approved leave.

61.     Plaintiff emailed Schmidt on April 4, 2024.  Plaintiff told him that she had not resigned or made a decision to retire, but was struggling with the physical and emotional toll of the hostile work environment she had endured.  She told Schmidt that she was unable to return to Zone 3 at that time, but also wanted to work with the City so that Zone 3 was not short on manpower.  She asked Schmidt to respond, but he never did.

62.     Later that day, Plaintiff received a voicemail from Chief Scirotto asking her to call him.

63.     When she did, Chief Scirotto said that McGuigan had a history of mistreating female officers.

64.    Chief Scirotto said that Plaintiff should not return to Zone 3, but also that he had nowhere else where Plaintiff could work as a Community Resource Officer.  Chief Scirotto recommended that Plaintiff go on the "Chief's List."

65.    Going on the Chief's List is a precursor to retirement; it permits Officers to use their accumulated PTO to bridge them to their retirement date.

66.    Plaintiff did not want to retire, but was left with no other reasonable option.

67.    Upon information and belief, Luffey is far from the only female that McGuigan disfavored and discriminated against because of sex.  Others include Sergeant Julie Stoops, Sergeant May Fong, and Officer Jody Sullivan.  Further upon information and belief, these officers among others reported their concerns over how McGuigan mistreated them up the chain of command.

<b>Count I – Title VII and PHRA<br>Disparate Treatment</b>

68.    Plaintiff incorporates the allegations above as though set forth in full.

69.    Defendant intentionally discriminated against Plaintiff with respect to the terms, conditions and privileges of Plaintiff's employment.

70.    Plaintiff's gender was a motivating factor in Defendant's disparate treatment of Plaintiff.

71.    Defendant acted willfully and/or in reckless disregard of Plaintiff's rights under Title VII.

72.    As the direct, proximate and foreseeable result of Defendant's discrimination, Plaintiff suffered harm.

WHEREFORE, Plaintiff demands judgment against Defendant and prays that the Court will award Plaintiff declaratory relief, her past and future lost wages and benefits, damages for

lost earnings capacity, compensatory damages, punitive damages, attorney's fees and costs of suit, and such other legal and equitable relief as the Court finds just and proper.

## Count II – Title VII and PHRA
## Hostile Work Environment with Tangible Employment Action

73.    Plaintiff incorporates the allegations above as though set forth in full.

74.    By virtue of the actions of Abraham and McGuigan described above, Plaintiff suffered intentional discrimination because of her sex.

75.    In its totality, Abraham and McGuigan's discrimination against Plaintiff was severe or pervasive.

76.    Abraham and McGuigan's discrimination detrimentally affected Plaintiff.

77.    Abraham and McGuigan's discrimination would detrimentally affect a reasonable person under like circumstances.

78.    The City is liable because Abraham and McGuigan were Plaintiff's supervisors and because Plaintiff was constructively discharged.

79.    As the direct, proximate and foreseeable result of Defendant's discrimination, Plaintiff suffered harm.

WHEREFORE, Plaintiff demands judgment against Defendant and prays that the Court will award Plaintiff declaratory relief, her past and future lost wages and benefits, damages for lost earnings capacity, compensatory damages, punitive damages, attorney's fees and costs of suit, and such other legal and equitable relief as the Court finds just and proper.

## Count III – Title VII and PHRA
## Constructive Discharge

80.    Plaintiff incorporates the allegations above as though set forth in full.

81.    Plaintiff intended to continue working through 2029

82.     After Officer Luffey reported a hostile work environment, Human Resources sustained her complaint against Lt. McGuigan as "supported with merit," but no remedial action was communicated to Luffey.

83.     Instead, senior leadership phoned her and suggested that she retire.

84.     Within weeks, the City coded Luffey as AWOL despite her approved leave from work.

85.     Day-to-day conditions were objectively intolerable.  McGuigan repeatedly denied Luffey access to a patrol vehicle - even when unused cars sat on the lot - forcing her at times to use her personal vehicle for police work.  Luffey's office was offered to a male.  She was told she was going to be required to work from a noisy room full of disruptions.  Reports sat unapproved for days, overtime was singled out for scrutiny and unique pre-approval requirements were imposed on Luffey that no other officer had to meet.

86.     The atmosphere was humiliating and intimidating.  McGuigan and Abraham derided Luffey to other officers as "useless," a "waste of a police officer," and of "no purpose," while demeaning her animal-welfare and community work as meaningless.

87.     After Luffey complained about McGuigan and Abraham, McGuigan confronted Luffey with menacing stares, placing her hand on her service weapon as she did so, which Luffey reasonably interpreted as a threat and message that McGuigan hated Luffey so much that she felt like killing her.

88.     Leadership acknowledged Luffey's trauma and floated a holding pattern (the Chief's List) but provided no alternative placement, no removal of the harasser and no restoration of the basic tools of the job.

17

89.     In short, the City knew about the unlawful conditions that McGuigan and/or Abraham had created, did not fix them and instead encouraged Luffey to retire.

90.     As the direct, proximate and foreseeable result of the gender-based disparate treatment described above, working conditions became so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign and/or retire.

91.     As the direct, proximate and foreseeable result of Defendant's constructive discharge of Plaintiff, Plaintiff suffered harm.

92.     But-for Defendant's constructive discharge of Plaintiff, Plaintiff would have continued working through 2029.

WHEREFORE, Plaintiff demands judgment against Defendant and prays that the Court will award Plaintiff declaratory relief, her past and future lost wages and benefits, damages for lost earnings capacity, compensatory damages, punitive damages, attorney's fees and costs of suit, and such other legal and equitable relief as the Court finds just and proper.

Respectfully submitted,

Charles A. Lamberton, Esq.
Pa. I.D. No. 78043
Lamberton Law Firm, LLC
2589 Washington Road, Suite 432
Pittsburgh, PA  15241
412-258-2250
cal@lambertonlaw.com

Counsel for Plaintiff
November 11, 2025

18